Willie D. YOUNG, Appellant,

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 97–CV–1354.**

District of Columbia Court of Appeals.

Argued Dec. 15, 1998.
Decided May 25, 2000.

Eric M. Rome, Washington, DC, for appellant.

Donna M. Murasky, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.

Before WAGNER, Chief Judge, and STEADMAN and FARRELL, Associate Judges.

WAGNER, Chief Judge:

Appellant, Willie D. Young, appeals from an order of the trial court granting summary judgment to appellee, District of Columbia (District), on Young's complaint for damages for wrongful eviction, negligence, and deprivation of constitutional rights under 42 U.S.C. § 1983. In his complaint, Young alleged that the District, acting through officers of the Metropolitan Police Department, assisted his sublessor in wrongfully evicting him from property in which he claimed to be a sublessee. Concluding that Young was "a mere occupant, arguably a trespasser, wrongfully in possession," the trial court dismissed the wrongful eviction claim. The court dismissed the constitutional claim for lack of evidence to establish a protectable interest, and the negligence claim, for failure to designate an expert witness. Young argues for reversal, contending that the trial court erred in granting summary judgment because: (1) the District assisted his sublessor in wrongfully evicting him; (2) no expert witness is required to prove negligence because Young's claim is that the District failed to provide any training for police enlisted to assist with evictions; and (3) evidence of the District's past practice of assisting with evictions contrary to law formed an adequate basis for his constitutional claims. We hold that a material disputed issue of fact on Young's wrongful eviction claim precludes summary judgment. Finding no error in the trial court's ruling on the remaining claims, we affirm summary judgment with respect to those claims.

## I.

### A. *Factual Background*

For purposes of the summary judgment motion, except as otherwise indicated, the following facts were undisputed. William Bibbs leased an apartment at 1360 Peabody Street, N.W. from Washington Realty Company under the terms of a lease agreement which prohibited Bibbs from subletting or transferring possession of the premises in whole or in part. Several years later, Bibbs allowed Young to live in the apartment with Bibbs' son. Bibbs did not occupy the apartment. In early April 1994, Bibbs notified his landlord that he would vacate the apartment on April 30, 1994. Although Bibbs informed Young of his plans, demanded his keys and said that he would no longer pay rent for the apartment, Young would not leave.[1] Young filed an application with the landlord to rent the apartment in his own name, but, according to his deposition testimony, his application was "squashed." After Bibbs had vacated the apartment, the landlord contacted him and explained that he was responsible for getting all occupants out, or he would remain liable. Bibbs again explained this situation to Young and requested him to vacate, but Young still refused to leave.[2] Finally, on May 14th, Bibbs summoned the police for assistance. Police officers came to the building two times that day in connection with this mat-

---

1. According to Young, Bibbs did not inform him that he was giving up the apartment until early May 1994.

2. Young explained at deposition that the reason that he did not leave was

[b]ecause I had made preparation to obtain an apartment myself, and plus I felt that he had no authority to even ask me to leave because I was making preparations to move in myself and he had gave up any right, any authority for the apartment.

ter.[3] Initially, a police officer told Bibbs that he could not remove Young from the premises. Finally, an officer arrived who informed Young that Bibbs had said Young was a trespasser and wanted him to leave and turn over his keys. When Young inquired about the basis for the officer's authority, the officer pointed to his shield. Young told the officer that he would not give him his keys, but would place them on the table. Young also took the keys from Bibbs' son, who was apparently to leave also, and placed them next to his, and told the officer he would have to pick up the keys himself.[4] The officer picked up the keys and put both Young and Bibbs' son out of the apartment. Bibbs' version of these events differs from Young's. Bibbs stated in a sworn response to an interrogatory that he had no conversation with Young on May 14, 1994, the day of Young's ouster. It was Bibbs' recollection that his wife spoke to Young that day and that "[s]he explained the situation to the police." Four days later, Young secured a temporary restraining order requiring Bibbs to allow him to re-enter the apartment; however, by the time Young returned, his possessions were no longer there.

The parties also dispute the circumstances surrounding Young's occupancy. According to Bibbs, he allowed Young to stay in the apartment with his son temporarily, while he looked for a place to live because Young had no job and was homeless. Bibbs stated that he paid the rent and bought food for his son and for Young and that he did not charge Young rent. According to Bibbs, from time to time, Young offered small amounts of cash to help out with the food and rental expenses that Bibbs was paying, but they never had any agreement that Young would be a subtenant, and Young never paid rent. According to Young, the lease was in Bibbs'

name, and he sublet the premises to his son before Young moved in. In describing his agreement with Bibbs, Young stated in response to interrogatories that

> When he [Young] moved into the premises in 1983, ... Bibbs was paying the rent for his son. My agreement with [Bibbs] was that I was to pay half the rent for the premises. I paid the rent ($200 a month) to ... Bibbs.

### B. Trial Court's Ruling

The trial court granted summary judgment for the District. The court concluded that Young was "a mere occupant, arguably a trespasser" and a stranger to the landlord. The court reasoned further that Young's rights, if any, derived from Bibbs who had relinquished possession. Therefore, the actions of the police in ejecting Young were against someone wrongfully in possession. The trial court also concluded that the wrongful eviction claim must fail because such a claim will lie only against a landlord, and the District was not a landlord and had no possessory interest in the property involved.

The trial court granted summary judgment for the District on the negligent training claim because Young did not designate an expert witness to establish the standard of care for training police officers assisting with evictions at the request of the person lawfully in possession. When the trial court granted summary judgment, the time for designating an expert witness had expired, and discovery was closed. The court also rejected Young's § 1983 claim because: (1) Young's right to remain in the property was not a federally protected right; and (2) in opposition to the motion for summary judgment, Young had failed to show a pattern of police conduct, "from which a *de facto* government policy to violate the statutory right of tenants may be inferred." For similar reasons,

---

3. Police officers came one other time at Young's request on an unrelated matter concerning a dispute he had with a friend of a tenant on the second floor of the building.

4. Bibbs' son told Young that the police were going to put them both out before Young went in to converse with the last officer who came.

the trial court granted summary judgment for the District on Young's remaining constitutional claims. The court also concluded that the District could not be held liable under a respondeat superior theory for Young's remaining constitutional claims.

## II.

Young argues on appeal that the trial court erred in concluding that he was not lawfully in possession as Bibbs' subtenant. Therefore, he contends, Bibbs could not evict him without court process, and the District is jointly and severally liable with Bibbs for assisting in his wrongful eviction. It is well settled in this jurisdiction that a landlord may not use self-help to evict a tenant and that "the legislatively created remedies for reacquiring possession [of real property] are exclusive." *Mendes v. Johnson*, 389 A.2d 781, 787 (D.C.1978). "A tenant has a right not to have his or her possession interfered with except by lawful process, and violation of that right gives rise to a cause of action in tort." *Id.* The District acknowledges that Young's wrongful eviction claim may go forward if Young was Bibbs' tenant at the time of the eviction. The District contends, however, that the undisputed facts show that Young was not Bibbs' tenant, but an invitee or roomer who became a trespasser by refusing to leave at the request of the lawful tenant who had surrendered possession to the landlord. Young counters that Bibbs had no right to surrender possession to his landlord without his consent or by first evicting Young through court process, since he was a tenant.

Where a tenant subleases property, the tenant has a responsibility to see that the subtenant vacates the premises in order to surrender them to the landlord without further liability. *See Sanchez v. Eleven Fourteen, Inc.*, 623 A.2d 1179, 1181

(D.C.1993). If a subtenant holds over, it is effectively a holding over by the tenant, and the landlord can hold the tenant liable for damages for the holdover period. *Id.* The tenant continues a relationship with the property as long as the subtenant remains. *Id.* Of course, a landlord can consent to the continued occupancy of the subtenant and create a new tenancy with the subtenant, and thereby relieve the tenant from further responsibility to pay rent for the premises. *See Comedy v. Vito*, 492 A.2d 276, 279 (D.C.1985). However, the landlord here specifically declined Young's request that he be substituted on the lease, and elected to hold Bibbs responsible for the property. Contrary to the trial court's ruling, Bibbs had not effectively relinquished possession when Young was ousted. Assuming that Young was Bibbs' tenant, Bibbs could not evict him except through court process. See *Mendes, supra*, 389 A.2d at 787. We consider whether there was a landlord-tenant relationship between Bibbs and Young which required court process in order for Bibbs to evict Young.

It is undisputed that Bibbs and Young had no written agreement establishing a subtenancy. However, certain tenancies may arise by oral agreement of the parties. Where real property is rented by the month without a written agreement, by statute, the estate created "shall be deemed [an] estate[ ] at sufferance." See D.C.Code § 45–220; *see also Comedy, supra*, 492 A.2d at 279; *Cavalier Apartments Corp. v. McMullen*, 153 A.2d 642 (D.C.1959); *Miller v. Plumley*, 77 A.2d 173 (D.C.1950). "[S]uch a tenancy requires payment of rent or 'hireings' or a 'rate per month' to accompany the estate." *Smith v. Town Ctr. Management Corp.*, 329 A.2d 779, 780 (D.C.1974) (citing D.C.Code 1973, § 45–820).[5] This statute itself does not prohibit the creation of a tenancy at sufferance in a subtenant.[6]

---

5. The definitions of a tenancy at sufferance in D.C.Code § 45–820 is the same in material respects to the definition in D.C.Code § 45–220.

6. There may be a contractual prohibition to subletting, as there was here. However, "restrictions contained in the original lease against subletting do not affect, as between

The question is whether the undisputed facts showed that Young was not a tenant, as the trial court concluded. "A landlord-tenant relationship does not arise by mere occupancy of the premises; absent an express or implied contractual agreement, with both privity of estate and privity of contract, the occupier is in adverse possession as a 'squatter.'" *Nicholas v. Howard*, 459 A.2d 1039, 1040 (D.C.1983). Whether a landlord-tenant relationship exists depends upon the circumstances surrounding the use and occupancy of the property. *See Anderson v. William J. Davis, Inc.*, 553 A.2d 648, 649 (D.C.1989). Factors for consideration in that determination include a lease agreement, the payment of rent and other conditions of occupancy between the parties. *Id.*[7] While it is undisputed that there was no written lease agreement, other material facts surrounding the nature of the relationship between Bibbs and Young are in dispute which bear upon the issue. According to Bibbs, he simply allowed Young to be a guest in his apartment temporarily while Young was unemployed and homeless, and Young occasionally made token contributions to the household. Such an occupancy arrangement would not give rise to a tenancy. *See*

*Jackson v. United States*, 357 A.2d 409, 410 (D.C.1976) (Where a defendant occupied an apartment rent-free without formal consideration, there was no tenancy at sufferance). Young, however, in a verified response to interrogatories, states that he had an agreement with Bibbs to pay him half the rent ($200) for the premises, which he paid. This disputed issue of fact is material because if Young, in fact, had an oral agreement to occupy the apartment in exchange for regular monthly rental payments as Bibbs' subtenant, a tenancy at sufferance would arise, requiring court process for termination. See D.C.Code §§ 45–1404, –16–1501; *see also Mendes, supra*, 389 A.2d at 787. At least as between Bibbs and Young, assuming a sublessor-sublessee relationship, Young would be entitled to the protections afforded tenants under the Housing Act.[8] The Rental Housing Act of 1985 (Housing Act), which enlarged the protections afforded tenants without leases from sudden evictions, extends to subtenants.[9] *See Anderson, supra*, 553 A.2d at 648. The Act itself includes a subtenant within the definition of "tenant." D.C.Code § 45–2503(36). Similarly, a sublessor is included within the definition of "housing provider."[10] That

the lessee and the sublessee, the validity of the sublease." 49 Am. Jur.2d *Landlord and Tenant* § 1162 (1993). *See also* Freedman on Leases § 7304d (4th ed.1997).

7. In *Anderson, supra*, the issue under consideration was whether two men who occupied an apartment in partial compensation for performing services in the building were tenants. *Anderson*, 553 A.2d at 648–49. In concluding that the men were not tenants, the court considered that "[t]hey did not pay rent, did not have a lease, and were allowed to occupy the employer-landowner's apartment only as an incident to the services they provided." *Id.* at 649. Therefore, the court determined that they were not entitled to a thirty days' notice to quit as required by D.C.Code § 45–1404.

8. For disposition of this appeal, we need not address the rights of Bibbs' landlord as against any subtenant. *See Sanchez, supra*

623 A.2d at 1181; *Haje's, Inc. v. Wire*, 56 A.2d 158, 159 (D.C.1947).

9. "This court has 'ruled on several occasions that rent control statutes [such as the 1985 [Housing] Act] prevail over provisions adopted earlier that govern evictions, to the extent that the provisions conflict.'" *Anderson, supra*, 553 A.2d at 649 (quoting *Habib v. Thurston*, 517 A.2d 1, 5 n. 3 (D.C. 1985)).

10. D.C.Code § 45–2503(15) and (36) provide respectively that:

"Housing provider" means a landlord, an owner, lessor, sublessor, assignee, or their agent, or any other person receiving or entitled to receive rents or benefits for the use or occupancy of any rental unit within a housing accommodation within the District. "Tenant" includes a tenant, subtenant, lessee, sublessee, or other person entitled to the possession, occupancy, or the benefits of any rental unit owned by another person.

Act provides, with limited exceptions, that "no tenant shall be evicted from a rental unit ... so long as the tenant continues to pay rent to which the housing provider is entitled for the rental unit." [11] D.C.Code § 45–2551. If the tenant fails to pay rent or violates other conditions of the tenancy and refuses to vacate voluntarily, the housing provider may recover possession only through court process. *See Mendes*, 389 A.2d at 787; *see also Anderson, supra,* 553 A.2d at 649. If the housing provider evicts the tenant without process, he can be liable in tort for wrongful eviction. *Id.*

The District argues that even if Young's evidence is credited, he could be no more than a paying guest or a roomer who is not a tenant within the meaning of the law governing landlord-tenant relationships. It contends that a paying resident in a rooming house cannot be a tenant within the meaning of the law governing landlord-tenant relationships.[12] The District contends that Young's evidence shows that he had only an informal agreement with Bibbs to pay half the rent so long as Bibbs allowed him to stay in the apartment. Therefore, when Bibbs asked Young to leave, and Young refused, he became a trespasser.

 The critical distinction between a tenant and a roomer is that "[a] tenant is a purchaser of an estate, entitled to exclusive legal possession, but a roomer has merely a right to use the premises." *Beall v. Everson,* 34 A.2d 41 (D.C.1943) (citations and footnotes omitted); *Taylor v. Dean,* 78 A.2d 382, 383 (D.C.1951). In *Taylor,* this court held that the status of intervenors in a suit for possession to be that of roomers where they had lived together like family in the home of the prior tenant.[13] *Id.* at 383. Where the owners occupied a portion of their six-bedroom home, sharing the kitchen, bathroom and dining room with the intervenors, who occupied two bedrooms, the court in *Taylor* found the evidence insufficient to support a finding that the owners had granted control of portions of the premises sufficient to create tenancies in the roomer. *Id.* In the present case, Bibbs did not occupy the apartment at all. According to Young's deposition testimony, he rented the basement apartment and had keys to the front and back entrances. There is no showing on the present record that Young was restricted to use of only a portion of the apartment as opposed to sharing with Bibbs' son the exclusive right of occupy the entire apartment under the arrangement with Bibbs. On the date that the police asked for Young's keys, they also asked for the son's

11. A "rental unit" is defined in the Housing Act, in pertinent part, to mean:

> any part of a housing accommodation as defined in paragraph (14) of this section which is rented or offered for rent for residential occupancy and includes any apartment, efficiency apartment, ... suite of rooms, or duplex.
>
> D.C.Code § 45–2503(33). D.C.Code § 45–2503(14) referenced in subsection (33) describes a "housing accommodation," in relevant part, as "any structure or building in the District containing 1 or more rentals units ...."

12. The District did not argue in the trial court that Young was a roomer. Therefore, the trial court did not consider whether Young was a roomer and whether the rights accorded tenants under the Housing Act extend equally to roomers. We do not, and need not

resolve whether individuals who rent a single room within a person's home or a rental unit are tenants within the meaning of the Act. See D.C.Code §§ 45–2503(14), (15), (33) and (36) and notes 10 and 11, *supra; see also Miller v. Avirom,* 127 U.S.App.D.C. 367, 384 F.2d 319 (1967) (generally, issues not raised in the trial court will not be considered on appeal). We discuss the distinction between a tenant and a roomer in this opinion only insofar as required to analyze Young's claim that he subleased the apartment from Bibbs.

13. The prior tenant formerly owned the property, but apparently remained in possession after foreclosure under a deed of trust, by reason of which the former owner and those in possession claiming under him are construed by statute as tenants at will. D.C.Code § 45–222; *Thompson v. Mazo,* 245 A.2d 122, 123 n. 1 (D.C.1968) (citing prior law to the same effect).

keys, who was sharing the apartment with Bibbs.[14]

The factual dispute concerning whether a landlord-tenant relationship existed between Bibbs and Young is a material fact essential to a determination of whether Bibbs wrongfully evicted Young with the assistance of the District's police officers.[15] Where there is a genuine issue of material fact in dispute, summary judgment cannot be granted.[16] *See Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C.1994); *Clay Properties, Inc. v. Washington Post Co.,* 604 A.2d 890, 893–94 (D.C.1992). Therefore, reversal on the wrongful eviction claim is required.

## III.

Young argues that the trial court erred in dismissing his claims for negligent training and supervision, deprivation of constitutional rights under 42 U.S.C. § 1983, and other constitutional claims for failure to name an expert witness. He contends that no expert is required because the alleged negligent conduct is within the realm of common knowledge and everyday experience. *See District of Columbia v. Hampton,* 666 A.2d 30, 35 (D.C.1995). He contends that the District has admitted that it provides no training to police officers concerning the appropriate conduct in landlord-tenant disputes concerning possession. The question then becomes whether the District was negligent in failing to provide any training, and no specialized knowledge is required to make that determination. However, the record shows that the District submitted evidence that it did in fact provide some training to its officers concerning the law of trespass and the D.C.Code generally. Young argues that such training was not sufficient and that it was essential to train the officers specifically on the prohibitions in the statutory scheme to self-help evictions.

In a negligence case, the plaintiff has the burden of establishing "'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury.'" *District of Columbia v. Hampton, supra,* 666 A.2d at 35 (quoting *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984)). Expert testimony will be required to prove the standard of care where it concerns a subject so related to some profession or occupation as to be beyond the realm of knowledge of an average lay person. *Id.* (citing *District of Columbia v. Peters,* 527 A.2d 1269, 1273

---

14. On the day that the police came, Bibbs' son came outside and met Young. According to Young, he was "upset and crying," and he told Young that "the police are going to put us out."

15. The District argued in the trial court that, even assuming that Young was Bibbs' tenant, the District could not be held responsible for a wrongful eviction because "[Young] had no privity of estate or privity of contract with the John Doe Police Officer or the District of Columbia." It contended that a claim for wrongful eviction could be maintained only against those having a possessory or ownership interest in the property, and therefore the claim could not be prosecuted against the District. Young argues on appeal that the District is a joint tortfeasor. *See Knell v. Feltman,* 85 U.S.App.D.C. 22, 174 F.2d 662 (1949); *see generally R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 544 (D.C.1991) (Joint tortfeasors contrib-

uting to single injury may be jointly and severally liable to injured party.) The District has abandoned this argument on appeal, and we do not address it here. It contends only that since Bibbs did not commit a tort in removing Young, the police did not commit a tort in assisting him in that effort.

16. According to Young's deposition testimony, when the police came to the apartment and requested him to leave, he did not protest that he was a lawful tenant or otherwise explain that he had the right to be there. The District did not argue in the trial court that it was undisputed that the police had no reason to know that Young was anything other than a trespasser, and therefore, cannot be held in tort for acting on the basis of the knowledge available at that time. Thus, the District did not treat this as a "material fact" relevant to its summary judgment motion, and calling for a response by Young. In such a posture, we do not address this issue on appeal.

(D.C.1987)). The trial court concluded, and we agree, that the level of training to which the District should be held in training police officers in this area is not within the common knowledge of lay persons. Therefore, we find no error in the trial court's order granting summary judgment on Young's negligent training claim after he failed to designate an expert within the time limits required by the court's order.

## IV.

Finally, Young contends that he showed an adequate basis to prevail on his § 1983 claim. Specifically, he relies upon facts purporting to show that the police engaged in a series of unconstitutional acts which support an inference that such acts were pursuant to a *de facto* policy. *See Gomez v. City of West Chicago*, 506 F.Supp. 1241 (N.D.Ill.1981). He relies upon the circumstances of the present case and three reported cases. In addition, he submitted the affidavit of the Executive Director of the Law Students in Court program stating that the organization had received several complaints from people claiming that the police had participated in wrongful evictions, apparently sometime in 1991 and 1992, which they had referred to private counsel. The trial court rejected Young's showing as insufficient because it outlined complaints without showing that the District had engaged in conduct which actually resulted in wrongful evictions. Young contends that his evidence was sufficient for a jury to determine that the District had been sued numerous times for its practices.

 Assuming that the police assisted Bibbs in wrongfully evicting Young, an issue which remains for determination, Young failed to show evidence supporting the § 1983 claim, as the trial court concluded. "Local governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Young argued that the District's policymakers were so indifferent to training police officers in the law pertaining to tenants' right in possession as to result so often in actions violating the constitutional rights that it amounted to a *de facto* policy. Young conceded in the trial court that there must be a series of unconstitutional acts shown to support an inference of a *de facto* policy which would give rise to liability. *See Gross v. District of Columbia*, 734 A.2d 1077, 1084 (D.C.1999); *Fulwood v. Porter*, 639 A.2d 594, 600 (D.C.1994); *Gomez, supra*, 506 F.Supp. 1241. Young relied upon only one case which predated the alleged unconstitutional action in this case. The other two cases post-dated Young's ouster from the premises. In any event, the three cases cited and the calls from several unspecified people allegedly complaining about wrongful evictions involving police action are insufficient to show the pervasive policy which Young attempts to show. Indeed, according to Young's sworn assertions, other police officers had come to the apartment earlier the same day and declined to assist in any attempt to evict him. Given these circumstances, we find no error in the trial court's conclusion that the evidence proffered was insufficient as a matter of law to support the inference of a *de facto* policy which would support liability on the constitutional claim; therefore, summary judgment was properly granted for the District on that claim.

For the foregoing reasons, summary judgment hereby is reversed on Young's wrongful eviction claim, and affirmed on the remaining claims.

*So ordered.*