*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CV-0987

KEVIETTE HOLMES, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-7609-17)

(Hon. Elizabeth C. Wingo, Trial Judge)

(Submitted February 11, 2021                    Decided January 27, 2022)

*Andrew P. McGuire* for appellant.

*Karl Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, *Carl J. Schifferle*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, for appellee.

Before EASTERLY, MCLEESE, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Keviette Holmes sued the District of Columbia and two of its police officers for wrongful eviction. Ms. Holmes's complaint alleged that she arrived home one day to find somebody claiming to be the home's new owner changing the locks on her doors. She called 911 and reported that a man was

changing the locks on "her home" and trying to "put her out." When officers arrived, Ms. Holmes explained to them that her father rented the home and she had been living in it for the past two years. After the individual changing the locks apparently indicated to the officers that he had recently purchased the home, the officers directed Ms. Holmes to leave upon threat of arrest, which she did. Upon the District's motion, the trial court dismissed Ms. Holmes's wrongful eviction claims against the District for failure to state a claim. Ms. Holmes maintains on appeal that this dismissal was in error. We agree and reverse.

## I.

Ms. Holmes's second amended complaint, the subject of the trial court's dismissal order, alleged the following: In 1998, Gwendolyn Rich and her husband purchased the property at 1903 Good Hope Road SE. Their son, Alex Rich, began managing the property sometime thereafter and rented it to James Holmes, Keviette Holmes's father, in 2011. Four years later, Mr. Holmes was hit by a bus and placed in a nursing home while recovering from his injuries. During her father's absence, Ms. Holmes moved into the property, notified Mr. Rich of her intention to stay, and began paying rent. She paid rent every month through November of 2017, when she alleges she was wrongfully evicted.

Several months prior, in July 2017, Alex Rich had approached Ms. Holmes stating his intention to sell the home and offering to pay her and her father $30,000 if they voluntarily vacated. Ms. Holmes refused the offer. Two months later, the Holmeses received a form notice from the Riches indicating that they had entered into a contract to sell the property to Ryan Pulliam. The notice further advised Mr. Holmes of his right to purchase the property with a matching offer under the District's Tenant Opportunity to Purchase Act, or TOPA. *See* D.C. Code § 42-3404.02 (2020 Repl.). Within weeks, Mr. Holmes arranged to sell his TOPA rights to a developer named Brian Bailey, on the condition that the Holmeses could remain as tenants in their home. Mr. Bailey then notified Mr. Rich that he had been assigned Mr. Holmes's TOPA rights and was exercising those rights to purchase the property. In October 2017, Ms. Holmes was notified that her father was ready to be discharged from the nursing home, and she began arranging for his return home. At the same time, Mr. Rich told Ms. Holmes that he did not want her and her father to return to the property because he intended to sell it to a third party other than Mr. Bailey, their TOPA rights notwithstanding. Mr. Rich then sold the property to Mr. Pulliam on or around November 8, 2017.

That same day, Ms. Holmes returned home to find Mr. Pulliam on the front porch. Mr. Pulliam told her that he was changing the locks and that she would have

to leave, and physically blocked her from entering. Ms. Holmes eventually persuaded Mr. Pulliam to let her inside the house to retrieve her phone, and once she did so, she called 911 and reported that "a man was trying to change the locks to her home and put her out." Police officers arrived on the scene about an hour later and spoke with Mr. Pulliam, who showed them an unspecified document. The officers next spoke with Ms. Holmes, who explained that her father rented the home and she had been living there for the past two years. The officers instructed Ms. Holmes to "leave the premises, pack a bag, and go," and made clear that she would be arrested "for unlawful entry and trespassing if she did not vacate as ordered." Ms. Holmes packed a small bag of things and left.

Ms. Holmes filed a lawsuit against Mr. Rich within the week. The litigation that followed was somewhat complex. The trial court entered a preliminary injunction concluding there was a wrongful eviction and permitting the Holmeses "to move back into the home." There were a number of defendants and claims— some settled, some dismissed—including successful cross-claims brought by Mr. Pulliam against the Riches.[1] However, the only claim at issue in this appeal is Ms. Holmes's claim against the District of Columbia for wrongful eviction.

---

[1] Mr. Rich appealed the judgment against him and in favor of Mr. Pulliam, and that appeal was consolidated with this one. Mr. Rich never filed an opening

Upon the District's motion, the trial court dismissed the wrongful eviction claim as set forth in Holmes's second-amended complaint, without prejudice, in an oral ruling from the bench. While the court found it to be a "close case," it ultimately concluded Ms. Holmes failed to allege the District's officers intended to oust a tenant, as it believed to be required for the intentional tort of wrongful eviction. The trial court stressed that while Ms. Holmes told responding officers "this is my home," that statement "is not the same as I have a right to be here, I paid rent, here is my lease." In the trial court's view, Ms. Holmes's allegations therefore did not indicate anything more than that the officers believed they were ejecting a mere trespasser from the premises, rather than a tenant. The officers were ultimately mistaken about that, the court acknowledged, but in its view, their mistake evinced mere negligence rather than an intentional eviction. The court further opined that as a practical matter the officers needed to do something to resolve the impasse—"if they leave [both Mr. Pulliam and Ms. Holmes] there, they do nothing, that's going to be irresponsible."

---

brief despite repeated orders from this court indicating that his failure to do so would result in the dismissal of his appeal. We therefore dismiss that appeal, No. 19-CV-1005, via an order issued contemporaneously with this Opinion.

Holmes timely appealed the dismissal of her wrongful eviction claim. *See Perry v. District of Columbia*, 474 A.2d 824, 825-26 (D.C. 1984) ("[D]ismissal of a complaint, even without prejudice, is sufficiently drastic to be deemed final, and therefore appealable.").

## II.

We review the "dismissal of a claim pursuant to a 12(b)(6) motion *de novo*, 'presuming the complaint's factual allegations to be true and construing them in the light most favorable to [the plaintiff].'" *Calomiris v. Calomiris*, 3 A.3d 1186, 1190 (D.C. 2010) (quoting *Bleck v. Power*, 955 A.2d 712, 715 (D.C. 2008)). "To survive a motion to dismiss, a complaint must set forth sufficient facts to establish the elements of a legally cognizable claim." *Woods v. District of Columbia*, 63 A.3d 551, 552-53 (D.C. 2013). While this pleading standard requires a plaintiff to allege "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," it "does not require 'detailed factual allegations.'" *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The only issue on appeal is whether Ms. Holmes adequately pled a claim of wrongful eviction against the District.[2] "In order to establish wrongful eviction, a tenant must prove that the landlord performed 'some act of a permanent character with the intention and effect of depriving the tenant of the enjoyment of the . . . premises . . . .'" *Hinton v. Sealander Brokerage Co.*, 917 A.2d 95, 101 (D.C. 2007) (quoting *Int'l Comm'n on Eng. in Liturgy v. Schwartz*, 537 A.2d 1303, 1305 (D.C. 1990)). "A tenant has a right not to have his or her possessions interfered with except by lawful process, and violation of that right gives rise to a cause of action in tort." *Young v. District of Columbia*, 752 A.2d 138, 142 (D.C. 2000) (quoting *Mendes v. Johnson*, 389 A.2d 781, 787 (D.C. 1978) (en banc), *abrogated in part on other grounds by Davis v. Moore*, 772 A.2d 204, 230 (D.C. 2001) (en banc)). Liability for wrongful eviction extends not just to landlords, but to those, including the District via its police officers, who intentionally assist the landlord in effectuating a wrongful eviction. *See id.* at 145 & n.15 (reversing summary judgment granted in favor of the

---

[2] There is an irrelevant dispute in the parties' briefs regarding whether the trial court dismissed the wrongful eviction claim under the "public duty doctrine." It did not, as the District accurately points out; the trial court dismissed only Ms. Holmes's independent claim of negligence under that doctrine, a ruling she does not appeal. The District does not maintain that the public duty doctrine bars the wrongful eviction claim against it. *See Klahr v. District of Columbia*, 576 A.2d 718, 719-20 (D.C. 1990) (extending the public duty doctrine to "claim[s] . . . that the District negligently failed to protect someone from harm"); *Oliver v. Mustafa*, 929 A.2d 873, 878 (D.C. 2007) (wrongful eviction is an intentional tort).

District on wrongful eviction claim, while noting via footnote the District did not maintain on appeal that a wrongful eviction claim could not be prosecuted against it); *Wilson v. Hart*, 829 A.2d 511, 512 (D.C. 2003) (reversing summary judgment granted in favor of the District on wrongful eviction claim); *Turpin v. Ray*, No. CV 19-2394, 2020 WL 1510412 at *19-20 (D.D.C. Mar. 30, 2020) (claim for wrongful eviction against District's officers for aiding landlord in eviction sufficiently pled to survive motion to dismiss).

The dispute between the parties narrows down to whether Ms. Holmes plausibly alleged that officers acted with the "intent to evict" her from the premises. We conclude that she did. The facts alleged include that (1) Ms. Holmes called 911 to report that "a man was trying to change the locks *to her home* and put her out" (emphasis added); (2) she told responding officers that she had lived in the home for the past two years; (3) the officers were aware that her belongings were inside the home, prompting their directive to "pack a bag"; and (4) the officers ordered Ms. Holmes to leave the premises upon threat of arrest. Moreover, there is no suggestion in the complaint (5) that Mr. Pulliam indicated Ms. Holmes was not a tenant, or (6) that Mr. Pulliam lived in the home or told the officers that he did.

The situation the officers confronted, if we credit Ms. Holmes's allegations as we must in this posture, was a classic self-help eviction in which a landlord was seeking to oust a tenant without a court order permitting him to do so. "The law is clear in this jurisdiction . . . that a landlord is prohibited from using self-help to evict a tenant and must proceed instead by using the process provided by law." *Hinton*, 917 A.2d at 102. By extension, officers are prohibited from intentionally assisting a landlord in effectuating such a self-help eviction, and the allegations here establish that is exactly what the District's officers intentionally did. The facts outlined above give rise to a plausible inference that officers knew they were ousting a tenant in furtherance of the landlord's self-help eviction.[3]

The trial court reached a contrary conclusion because, in its view, the officers intended only to "prevent[] a trespass as opposed to assist[] an eviction." It drew that inference because the officers threatened to arrest Ms. Holmes "for unlawful

---

[3] Our precedents also leave open the possibility that a wrongful eviction "may lie even if [the plaintiff's] occupancy constituted something less than some sort of tenancy." *Sarete, Inc. v. 1344 U St. Ltd. P'ship*, 871 A.2d 480, 494 (D.C. 2005) (quoting *Wilson*, 829 A.2d at 515 n.9); *see also Turpin*, 2020 WL 1510412 at *20 (denying motion to dismiss where facts alleged "some right to the property even if it is less than tenancy" given that plaintiff "made payments in exchange for housing"); *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 54 (D.D.C. 2017) (rejecting argument, at motion to dismiss stage, that plaintiff's "wrongful eviction claim must fail because" plaintiff was not a "tenant").

entry and trespassing," and because there was no allegation that Ms. Holmes told the officers she "paid rent" or presented them with a lease. In the trial court's view, those allegations (and lack thereof) established that the officers "thought [Ms. Holmes] was a trespasser" and therefore the District could not be liable for the intentional tort of wrongful eviction. There are several flaws with that reasoning.

First, that officers threatened to arrest Ms. Holmes for unlawful entry does not in itself establish that they believed she was guilty of that crime or that they did not think she was a tenant. Consistent with our obligation to construe the alleged facts "in the light most favorable" to Ms. Holmes, *Calomiris*, 3 A.3d at 1190, the officers' alleged threat might just as readily be seen as an idle one, or the threat of an unlawful arrest in an effort to expedite a resolution to the conflict. Another possibility is that the officers misunderstood the applicable law and believed that even if Ms. Holmes was a tenant, she nonetheless committed a trespass when she refused the owner's command to leave the premises. Any of these scenarios is entirely consistent with the officers' believing Ms. Holmes was a tenant.

Second, even if officers did believe Ms. Holmes was a mere trespasser, the facts alleged do not establish that this belief was a reasonable one.[4] "Whether a landlord-tenant relationship exists depends upon the circumstances surrounding the use and occupancy of the property." *Young*, 752 A.2d at 143. There were many signs, based on the allegations, that Ms. Holmes was not a mere trespasser or squatter. She was the one who called 911; she reported it was "her home"; she told the responding officers she had been living there for years; the home was full of her belongings; and there was no suggestion Mr. Pulliam lived there or indicated to officers that he did. Those are hardly the hallmarks of a squatter. There was no allegation the home was in disarray, that there were any signs of breaking and entering, or that Mr. Pulliam even told officers Ms. Holmes was not a tenant. That Mr. Pulliam was changing the locks to "put her out" in fact suggests Ms. Holmes had keys to the home, which squatters tend not to have.

---

[4] While we have previously reserved judgment on the question whether the District's officers' "good faith reasonable belief that plaintiffs were unlawfully on the premises" might obviate the District's liability for a wrongful eviction, *Wilson*, 829 A.2d at 515 n.11, we have never suggested an unreasonable belief might do so. The District does not now ask us to adopt that view. Instead, it defends the trial court's reasoning that the officers did not have "reason . . . to know" Ms. Holmes was a tenant in the home. We think the facts alleged, if true, gave the officers reason to know Ms. Holmes was a tenant in the home.

Third, the trial court erred when it downplayed the above facts and instead focused on what more Ms. Holmes could have done to substantiate her tenancy, namely, presenting the officers with a lease or expressly telling them she paid rent. The absence of such allegations is hardly critical at the pleading stage, where a plaintiff is not required to exhaustively detail each and every pertinent fact. *See Potomac Dev. Corp.*, 28 A.3d at 544. Even if the officers believed that Ms. Holmes did not have a lease (given her indication that her father rented the house) and did not pay rent (contrary to her allegations), that alone would not establish that she was not a tenant. We have stressed that whether there is a landlord-tenant relationship is a fact-laden question. *See Young*, 752 A.2d at 143. According to the complaint, the officers were told that Ms. Holmes had lived in the house for two years, apparently had the keys to the house, had her belongings inside, and the primary lessee was her father. That put the officers on sufficient notice that she was a tenant without requiring her to affirmatively do more to establish as much.

Fourth, although the trial court repeatedly stressed the fluid situation the officers confronted, that they needed to do something to resolve it, and that they did "their best under the circumstances,"[5] this was simply not the Catch-22 situation that

---

[5] This reasoning seems to import a malice-type standard into the intentional tort of wrongful eviction, that is, that the officers must have understood that their

the trial court believed it to be. As an initial matter, Ms. Holmes's allegations do not indicate that the officers did their best in the situation. The complaint painted a picture of officers who simply sided with the homeowner over an apparent tenant for reasons that cannot be blindly attributed to good faith, particularly not at the pleading stage. In any event, the trial court's concerns were misplaced because, according to Ms. Holmes's allegations, the officers were not confronted with dueling claims of tenancy, but with one person (Mr. Pulliam) who claimed to be the home's owner and just one person (Ms. Holmes) who claimed to live there, without refute. The proper course was for the officers to direct the homeowner to cease the unlawful self-eviction and instead to go through the proper judicial process to obtain an order of eviction. *See Young*, 757 A.2d at 142 ("[T]he legislatively created remedies for reacquiring possession [of real property] are exclusive.") (quoting *Mendes*, 389 A.2d at 787).

## III.

The Superior Court's judgment is reversed and the case is remanded for further proceedings.

---

conduct was unlawful. We see no support for that in our precedents and the District does not advance that position on appeal.

*So ordered.*