**SARETE, INC., et al., Appellants,**

v.

**1344 U STREET LIMITED PARTNERSHIP,**
**Appellee.**

No. 03–CV–1045.

District of Columbia Court of Appeals.

Argued Feb. 17, 2005.

Decided April 7, 2005.

Nigel L. Scott for appellants.

Deborah J. Israel, Washington, with whom Louis J. Rouleau was on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and FERREN, Senior Judge.

REID, Associate Judge:

In this commercial landlord-tenant matter, the trial court dismissed, under Super. Ct. Civ. R. 12(b)(6), the claims of appellants Nebeyu Samuel and Abeba Touelde for breach of contract, wrongful eviction, illegal seizure of business property and inventory, as well as their demands for damages. The case proceeded to a bench trial on appellant Sarete, Inc.'s claims. The trial court granted judgment against appellant Sarete, Inc. on all of its claims, as well as its demand for damages. Appellants filed a timely appeal contending that the trial court improperly dismissed the individual plaintiffs' claims, and erred in granting judgment in favor of appellee 1344 U Street Limited Partnership. We dispose of the parties' arguments on appeal as follows:

(1) In this notice pleading jurisdiction, we hold that the claims of the individual plaintiffs should not have been dismissed under Super. Ct. Civ. R. 12(b)(6) because their complaint fairly put the appellee on notice of the claims against it, and the individual appellants alleged facts which, if construed in the light most favorable to them and if taken as true, demonstrate that they had at least something analogous to a landlord-tenant relationship with the appellee and that they had assumed the obligations of the original tenant under the Lease Agreement. And, since the record on appeal and our resolution of the legal issues in this case reveal that all of the appellants are entitled to judgment as a matter of law as to their claims for wrongful eviction and breach of contract, we reverse the judgment of the trial court with respect to the claims of the corporate appellant for wrongful eviction and breach of contract, as well as its order dismissing the claims of Mr. Samuel and Ms. Touelde, and remand those matters to the trial court with instructions to enter judgment in favor of all the appellants on Count I (breach of contract) and Count II (wrongful eviction).

(2) We hold that the appellee waived its lease contract prohibition on the tenant's assignment of the lease to a third party, the corporate appellant, when it continued to accept rent payments from Mr. Samuel despite its knowledge of and signature on the Assignment of Lease agreement between its original tenant and the corporate appellant.

(3) We hold that, on the record before us, the evidence would not sustain a finding that the appellants made a fraudulent or material misrepresentation in the Assignment of Lease agreement, because fraud must be alleged with particularity and proved by clear and convincing evidence. Appellee failed to allege fraud with particularity and presented no proof, let alone clear and convincing proof, of a fraudulent or material misrepresentation by appellants.

(4) We conclude that appellants were not trespassers as a matter of law, and that the corporate appellant acquired privity of estate with the landlord when (a) the appellee waived the contractual prohibition against assignment by the tenant and (b) the appellants assumed the original tenant's obligations under the lease. Furthermore, because the appellants assumed the original tenant's obligations under the lease, and the original tenant relinquished or waived any right to the leasehold and returned his keys to the landlord, the corporate appellant also was in privity of contract with the appellee. Consequently, there was at least "some sort of tenancy" or landlord-tenant relationship between the corporate appellant and the appellee

landlord. Under these circumstances, we hold as a matter of law that the appellee landlord could not lawfully resort to self-help to evict the appellants, and since the landlord failed to use legal process in its efforts to evict the appellants, they were entitled to judgment on their wrongful eviction claim.

(5) We agree with the trial court that the appellants waived their constitutional Seventh Amendment right to trial by jury in light of a comprehensive, unambiguous waiver of that right which is set forth in the Contract of Lease agreement.

(6) Finally, because the individual appellants should have been permitted to present evidence as to Counts III (illegal seizure of business property and inventory) [1] and Count IV (damages) of their complaint, we remand these matters to the trial court for a new trial.[2]

## FACTUAL SUMMARY

This is not a straightforward case. The record reflects confusing and somewhat unorthodox commercial dealings between the parties and others regarding the ownership, occupancy, and operation of a restaurant on the second floor of property located at 1344 U Street, in the Northwest quadrant of the District of Columbia. The record also shows that the trial judge carefully tried to unravel a confusing scenario of transactions, marked by the absence of receipts and other documentation. We be-gin by summarizing the factual context of the case, including the factual findings of the trial court and its conclusions.

On August 29, 2000, Nebeyu Samuel, Abeba Touelde, and Sarete, Inc. ("Sarete") filed a complaint against 1344 U Street Limited Partnership ("U Street") pertaining to a dispute about their operation of a club, Café Tango, on the second floor of the U Street property. They alleged that Mr. Samuel and Ms. Touelde [3] were the sole stockholders of Sarete, and that the owner and landlord of the U Street property had unlawfully "locked [them] out of the premises." In Count I of the complaint, the appellants asserted breach of contract and based their claim to occupancy of the premises on "the assignment of a lease agreement signed by another party"; and "the written approval of the landlord, through the agent of the landlord, Alyson Myers," with respect to their application for an occupancy permit, a license to serve alcoholic beverages, and other necessary licenses. They further alleged that U Street "breached the contract by changing the locks to the premises without filing civil suit in the Landlord and Tenant Branch of the Superior Court of the District of Columbia or any other branch of the Court."

Count II of the complaint claimed wrongful eviction of Sarete and the individual plaintiffs despite payment of rent

---

1. Since the trial court did not reach Count III with respect to the corporate appellant, the corporate appellant also may present evidence on remand as to Count III.

2. The trial court did not specifically address Sarete, Inc.'s claim of illegal seizure of business property and inventory in its Memorandum Opinion and Judgment. Thus, whether or not Sarete, Inc. was entitled to damages on that claim remains unresolved. Moreover, since Mr. Samuel and Ms. Touelde had been dismissed as plaintiffs under Rule 12(b)(6), despite the court's reference to "Plaintiffs" in the plural, it apparently concluded only that Sarete, Inc. "failed to present evidence to substantiate the damages" demanded on its claims. Mr. Samuel and Ms. Touelde argue that had they not been dismissed as plaintiffs, they could have established damages for all plaintiffs. Mr. Samuel and Ms. Touelde are entitled to submit evidence as to damages relating to all of their claims.

3. Ms. Touelde's name also appears in the record as "Toulede."

and the proper licenses to run the club, which had been granted to them by the District government. They stated that they had closed the café for a period of time to make $25,000 worth of repairs, and acknowledged that they had been late in tendering rent payments. Nevertheless, they made payments of $2,100, $4,200, and $10,500 in back rent in June and July, but could not "reach" Ms. Myers to give her the remaining balance of $2,100 on July 10, 2000, because "she was out of town." Despite the back payments and the keys Ms. Myers gave them to enter the café, "they no longer had access to the premises because the locks had ... been changed...." They maintained that U Street "illegally utilized self-help means to evict [them] from the premises without due process of law," and in doing so, "breached [their] rights as a tenant in the premises."

In Count III of the complaint, appellants alleged "illegal seizure of business property and inventory." This business property and inventory were located inside the café and had a value of $20,000. Finally, in Count IV of the complaint, appellants sought $500,000 in damages "for actual losses in income and personal property, restaurant furnishing, furniture, equipment and other goods resulting from the wrongful eviction." They also demanded punitive damages in the amount of $500,000 on account of U Street's "egregious behavior in locking [them] out [and] evicting [them] from the premises on two occasions after accepting rental payments from [them] and giving them promises that their right to use the property as a place of business would be protected." Furthermore, they requested a jury trial and asked for injunctive relief. After a hearing on plaintiffs' request for a temporary restraining order, the Honorable Ronald Wertheim denied the request, essentially on the ground that because of a lack of receipts or documentation, the court could not determine "in what capacity" Mr. Samuel made rent payments to Ms. Myers.

U Street moved to dismiss the claims of Mr. Samuel and Ms. Touelde on September 25, 2000 (motion was refiled on October 13, 2000), on the ground that they "lack[ed] standing to assert the claims of [Sarete]" and "failed to set forth cognizable claims." Specifically, they stated that "[o]nly Sarete [ ] claims to have rights under a lease agreement with [U Street]" and neither Mr. Samuel nor Ms. Touelde "is in privity of contract or privity of estate with [U Street]." On September 26, 2000, U Street filed an answer, and a counterclaim against plaintiffs alleging destruction of property, closure of business, breach of contract—failure to pay rent, and trespass. And, on September 29, 2000, U Street filed a motion to dismiss Sarete's demand for a jury trial, essentially because in the underlying lease, the right to a jury trial was waived expressly.

Although appellants opposed U Street's motions to dismiss their claims and to strike their demands for a jury trial, the Honorable Joan Zeldon docketed an order on February 22, 2001, dismissing the claims of Mr. Samuel and Ms. Touelde, under Super. Ct. Civ. R. 12(b)(6), on the ground that:

Based upon the information that Plaintiffs have plead in the Complaint, only the corporate Plaintiff, Sarete, Inc., maintains a leasehold interest in the property. See Complaint at 3, ¶ 1. There is no assertion in the Complaint that Plaintiff Samuel or Plaintiff Touelde have privity of contract and privity of estate with Defendant, nor has any evidence been offered by Plaintiffs on these issues. See Young v. District of Columbia, 752 A.2d 138, 143 (D.C.2000). Since Plaintiffs Samuel and Touelde can prove

no set of facts in support of their individual claims which would entitle them to relief, all of their individual claims must be dismissed with prejudice.

Judge Zeldon also granted U Street's motion to strike the jury trial demand based on the lease, because of "Plaintiffs' failure to proffer any evidence suggesting that they are not bound by such a waiver provision." Ultimately, after an appeal had been lodged in this court concerning the dismissal of the individual plaintiffs, Judge Zeldon denied appellants' motion to alter, amend or modify judgment in an order docketed on September 24, 2001,"because of the pending appeal of [her February 2001] order, [but] note[d] [the Court's] willingness to change its dismissal with prejudice to a dismissal without prejudice if the Plaintiff[s] file a Motion to Remand the case from the Court of Appeals."

Eventually, the case was transferred to the Honorable Anna Blackburne–Rigsby. Thereafter, the parties engaged in discovery and motions practice. On June 26, 2003, Judge Blackburne–Rigsby denied U Street's motion for summary judgment, because of material facts in question. As the court declared:

> The central issue in this case is whether there was a valid assignment of the lease between Bahare [Gebremedhin] and [U Street] to the plaintiff, Sarete. As a precondition to the assignment of the lease, Sarete needed to purchase the assets of the premises to secure a lien. Plaintiff asserts that it entered into a sales agreement with Bahare to purchase the assets of the premises. Defendant contends that Sarete as a corporation did not purchase the assets, but instead [Ms. Touelde] purchased the assets as an individual thereby not satisfying the condition precedent. Defendant asserts that since no assignment ever took place, Bahare was the valid leaseholder of the premises. Thus, defendant contends, when Bahare wrote to defendant in March 2000, he voluntarily surrendered the premises and terminated the lease. Plaintiffs (sic) assert that Bahare was not the valid leaseholder and had no rights to terminate the lease. Since there is a question of whether [Ms. Touelde] was acting as an officer of Sarete when she purchased the assets, this presents an issue of material fact.

The court noted that other facts also were in dispute. Consequently, the case proceeded to a bench trial. The trial extended from June 30, 2003 to July 9, 2003.

On August 25, 2003, Judge Blackburne–Rigsby issued a memorandum opinion and judgment. She made factual findings based on the trial testimony and exhibits introduced into evidence by the parties. On July 10, 1997, U Street "leased the second floor of the premises to Mr. Bahare Gebremedhin [and another person who subsequently dropped off the lease] for the operation of a restaurant-bar." The written lease covered a five-year period. Sarete was incorporated on November 3, 1997, with Ms. Touelde as President and Secretary, Mr. Samuel as Vice President and Treasurer, and Mr. Gebremedhin as Director. The record does not show the initial stock ownership of Sarete, but the trial court found that ultimately Ms. Touelde and Mr. Samuel became the sole stockholders of Sarete.

On June 26, 1998, "Mr. Gebremedhin [4] of a District of Columbia Corporation (Owner)" and "[Ms.] Touelde of Super

---

4. The spelling of Mr. Gebremedhin's name on the Management Agreement, and at other places in the record, is "Gebremehedhin."

Café Inc., a District of Columbia Corporation (Manager)" entered into a two-year Management Agreement. However, the Management Agreement was signed by Mr. Samuel as Manager, rather than Ms. Touelde. The Management Agreement mentioned a restaurant known as AS-MARA, which operated at the U Street property and in which Mr. Gebremedhin had an interest. The Management Agreement also identified the "Super Café," which was located at the U Street property, and specified that Ms. Touelde as Manager would manage the Super Café. In addition, the Management Agreement provided that Mr. Gebremedhin "has entered into an agreement for the sale of the business assets [of Super Café] to [Ms. Touelde's] Manager's company. The Management Agreement recited that "[p]ending the closing and settlement Agreement and the issuance of the ABC License, [Mr. Gebremedhin and Ms. Touelde] desire to enter into an agreement granting [Ms. Touelde] the right and authority to operate the restaurant business fully and for all intents and purpose as if [she] were the Owner of the business." The sales price of the business was fixed at $30,000. With respect to rent owed to the landlord, paragraph 5.1 of the Management Agreement specified that: "Manager [Ms. Touelde] shall pay to the landlord as a monthly rent for the premises the sum of $2,100.00 payable on the first day of each month in accordance with the terms of the lease agreement for the premises, a copy of the Lease Agreement is attached hereto as Exhibit No. [unidentified]." Mr. Samuel and Ms. Touelde took over management of the café in July 1998.

In mid–1998, Ms. Touelde "entered into a contract with Mr. Gebremedhin to purchase assets of Sarete, Inc. d/b/a Café Tango ... [for] ... $30,000." Both Ms. Touelde and Mr. Samuel signed the agreement as "Purchaser." Papers for the as-set sale of Sarete were executed beginning on August 14, 1998, with a Bill of Sale signed by Mr. Gebremedhin, Mr. Samuel and Ms. Touelde. Ms. Touelde signed a Security Agreement to secure a $15,000 promissory note in behalf of creditors. A Bulk Sales Affidavit was signed by Mr. Gebremedhin on October 14, 1998. The court found that "Ms. Toulede and Mr. Samuel intended to purchase the assets of Sarete, Inc. and tendered valid consideration for such purchases of $30,000." The October 19, 1998 minutes of a Sarete, Inc. "meeting signed by Mr. Gebremedhin list [him] as President and Secretary, [and the minutes state] that transfer of assets of Sarete will take place upon satisfaction of lien." The lien apparently was a reference to a promissory note in the amount of $15,000. A "Settlement Sheet [was] signed by Mr. Gebremedhin, Ms. Toulede and Mr. Samuel, in February 1999, indicating [that] all payments for the [asset] sale [had been] made to Mr. Gebremedhin."

When Mr. Samuel and Ms. Touelde sought a liquor license from the District government on October 27, 1998, "[t]hey could not complete the application because [they] did not have a lease." The trial court found that the asset sale was consummated on October 29, 1998, when "[t]he assets of Sarete, Inc.... were transferred from Mr. Gebremedhin to Mr. Samuel and Ms. Toulede as sole shareholders of Sarete, Inc." However, the trial court also found that the settlement sheet for the sale of assets "indicat[ed] all payments for the sale [were] made to Mr. Gebremedhin" in February 1999.

The trial court determined that Mr. Samuel and Ms. Toulede initially took over the business without the knowledge of Ms. Myers or anyone else from U Street. Sometime in November 1998, however, "Mr. Samuel and Mr. Gebremedhin met with Ms. Myers for the first time to dis-

cuss a possible assignment of the lease." Ms. Myers signed the Assignment of Lease on November 24, 1998, apparently without any discussion of the asset sale. The trial court further found that:

An Assignment of Lease was executed between Mr. Gebremedhin, assignor, Mr. Samuel, assignee, and Ms. Alyson Myers, landlord. Assignment was conditioned upon Assignee's, (Mr. Samuel) purchase from Assignor (Mr. Gebremedhin) of the assets of Café Tango. Mr. Samuel testified that he needed a lease before he completed the sale with Mr. Gebremedhin. When he met with Ms. Myers to sign the Assignment of Lease she did not ask for any documentation regarding the transfer of assets. Defendant alleges she signed the Assignment of Lease as a favor to Mr. Samuel in order for him to receive a liquor license, and it was their understanding that this was a trial period and he was still acting as the manager. No one told her that the assets had been purchased at this meeting. The Court found Ms. Myers' testimony on this issue to be credible. Mr. Samuel received a Certificate of Good Standing from the D.C. Office of Tax and Revenue indicating that he had filed and/or paid ... D.C. tax(es) for Sarete, Inc.

The ABC license application was accepted by the District government on November 25, 1998.

Beginning in December 1998, Ms. Myers experienced problems with Mr. Samuel's timely payment of the rent. Checks given to Ms. Myers in December 1998 and January 1999 were returned for "insufficient funds." Ms. Myers then demanded payment in cash. On March 18, 2000, Ms. Myers advised Mr. Gebremedhin that he was "the recognized tenant, that the locks would be changed on March 23, 2000; and that the rent [was] in arrears in the amount of $16,100." She demanded that sum in thirty days. In a letter received by Ms. Myers on March 23, 2000, Mr. Gebremedhin "acknowledg[ed] [that he was] the tenant of the premises, recogniz[ed] that the lease was in default, and return[ed] the keys to [the U Street property]." When Ms. Myers received the keys and noticed that the property was not occupied, she "changed the locks to the second floor of the premises prior to April 18, 2000. Mr. Samuel requested more time to pay the back rent, and later "paid the arrearages." Ms. Myers then gave him a key to gain access, but testified that she did so "in order [to] retrieve property but not to operate the restaurant."

On May 31, 2000, Ms. Myers again "informed Mr. Samuel [that] he was delinquent on back rent payments." In late May and June 2000, Mr. Samuel and Ms. Touelde made payments to Ms. Myers of $10,500 and $2,100. Once she received these payments, Ms. Myers demanded the key to the premises in July 2000, and changed the locks again when Mr. Samuel did not return the key. In July 2000, Mr. Samuel made payments to Ms. Myers of $4,200 and $2,100. The $2,100 payment was made on July 11, 2000. The trial court found that Ms. Myers gave Mr. Samuel a new key on that date, but he still could not gain access to the U Street property because "neither this new key nor his old key fit the lock." Mr. Samuel attempted to make a final arrearage payment to Ms. Myers in July "but she was not at home and he could not locate her."

After making factual findings, Judge Blackburne–Rigsby concluded that Mr. Samuel and Ms. Touelde "failed to establish that a valid landlord[-]tenant relationship existed between them and [U Street] and therefore plaintiffs are precluded from asserting a claim of wrongful eviction."[5]

5. Although Mr. Samuel and Ms. Touelde had been dismissed as plaintiffs, the trial court at

The trial court declared that "plaintiffs were in violation of section 12 of the Contract of Lease Agreement prior to the execution of the Assignment," and that "[t]his material misrepresentation or non-disclosure renders the assignment void *ab initio*" because section 12 of the Contract of Lease between Mr. Gebremedhin and U Street specified that the consent of the landlord was required before any transfer or assignment of interest could be deemed valid. There was a "fraudulent[ ] misre-presentat[ion]," the trial court concluded, because "the transfer of the business had already taken place prior to the execution of the Assignment of Lease agreement.... " The trial court stated that "Ms. Myers relied on the condition precedent set forth in the Assignment of Lease because requiring the plaintiffs to purchase the assets of Café Tango as a condition precedent provided a trial period to conduct business with the Plaintiffs before the Assignment took full effect."

Furthermore, the trial court asserted that the plaintiffs were not lawful subtenants and had no implied tenancy, essentially because Ms. Myers told Mr. Gebremedhin and Mr. Samuel in a letter of March 18, 2000, that Mr. Gebremedhin was "recognized as the tenant" of the U Street property, and that on March 22, 2000, Mr. Gebremedhin recognized that he had defaulted on the lease, and hence, "waive[d][his] rights as leaseholder and return[ed] the keys" to Ms. Myers. Finally, the trial court denied plaintiffs damages because of their failure "to present evidence to substantiate the damages they are seeking," and because "the Plaintiffs were not lawful tenants since no valid assignment existed."

times used the plural to refer to "plaintiffs" instead of the singular "plaintiff" to refer to Sarete, the remaining plaintiff after the Rule

## ANALYSIS

Appellants make several arguments on appeal. We turn first to their contention that they had a valid landlord-tenant relationship with the U Street property which precluded the landlord's resort to self-help to evict them by changing the locks to the Café Tango. Appellee maintains that appellants were neither lawful tenants nor lawful subtenants and that there was no implied tenancy. In addition, citing *Young v. District of Columbia*, 752 A.2d 138, 143 (D.C.2000), a residential case, appellee argues that: "To establish a cognizable landlord-tenant relationship, District of Columbia law requires privity of contract and privity of estate between plaintiff and defendant."

■ We begin with the legal doctrine of self-help. The trial court did not address this doctrine, even though it was set forth in appellants' complaint and relied on by the plaintiffs during proceedings in the trial court. The trial court apparently did not consider this doctrine because of its conclusion that no valid landlord-tenant relationship existed between appellants and appellee. In *Simpson v. Lee*, 499 A.2d 889 (D.C.1985), we held that our decision in *Mendes v. Johnson*, 389 A.2d 781 (D.C. 1978) (en banc), concerning the use of self-help to evict a residential tenant, is applicable to commercial tenancies:

In *Mendes v. Johnson*, 389 A.2d at 787, this court, sitting en banc, abrogated the landlord's common law right of self-help and held that the legislatively created remedies for reacquiring possession are exclusive. The court held that Congress had, by necessary implication, abolished the common-law right of self-help when it provided a statutory summary proce-

12(b)(6) motion was decided against Mr. Samuel and Ms. Touelde.

dure. *Id.* at 786. Although *Mendes v. Johnson* involved a residential tenancy, the court, by specifically overruling *Snitman v. Goodman*, 118 A.2d 394 (D.C.1955), made clear that the rationale for its decision is equally applicable to commercial tenancies, and *Mendes v. Johnson* has been so construed. *See Davis v. Gulf Oil Corp.*, 485 A.2d 160, 173 (D.C.1984).

499 A.2d at 893 (citations omitted). *Mendes, supra,* specifically held that the "statutory remedies [for reacquiring possession of property] are exclusive ... and that an action will lie in tort against a landlord who evicts a tenant without legal process." *Id.* at 782. We further declared that: "A tenant has a right not to have his or her possession interfered with except by lawful process.... " [6] *Id.* at 787. As the trial court undoubtedly recognized, before we can determine whether U Street, as landlord, unlawfully resorted to self-help against appellants, we must decide whether any or all of them had the status of a tenant. This is a legal question which we review *de novo;* however, in conducting our review, we are bound by the trial court's factual findings unless they are "plainly wrong," or clearly erroneous. D.C.Code § 17–305 (2001).

### Appellant's Status: The Trespass Doctrine

■ The record is not clear as to the exact status of the appellants in relation to the U Street property. The trial court concluded that they were not tenants, subtenants, or implied tenants, but we see no precise factual finding or legal conclusion that they were trespassers, even though paragraph 12 of Count IV of U Street's counterclaim specifically alleged: "Counter–Defendants trespassed on the Premises by entering without owner's permission and without right and by gaining access through another tenant's space." Ms. Touelde and Mr. Samuel paid $30,000 to acquire the assets of Sarete, and made in excess of $16,000 in rent payments directly to Ms. Myers for the operation of Café Tango. These payments were accepted by the landlord. Indeed, Ms. Myers accepted a rent payment from Mr. Samuel on July 11, 2000, after Mr. Gebremedhin had relinquished any control over the leasehold and had returned the keys to the premises to her. Not only did she accept the rent payment, but she also gave Mr. Samuel a key to the premises where Café Tango was located, although the key did not work. And, there is no indication on this record that Ms. Myers regarded the July 11, 2000 rent payment as having been made in behalf of, Mr. Gebremedhin, as she argued with respect to other payments made by Mr. Samuel. Moreover, appellants' actions at the 1344 U Street property do not fall within the ambit of a trespass. "[A] trespass is an unauthorized entry onto property that results in interference with the property owner's possessory interest therein." RICHARD R. POWELL, POWELLON REAL PROPERTY, § 64A.02[1] at 64A–16, at 64A–16 (Michael A. Wolf ed.2000). Given Ms. Myers' dealings with appellants beginning at least in November 1998, it cannot be said that theirs was "an unauthorized entry onto" the U Street property, at least from November 1998 forward. Significantly, U Street made no effort from November 24, 1998 through September 2000 to evict appellants legally for trespass. Consequently, to determine

---

6. The trial court did cite the *Mendes* case but only in its discussion of punitive or exemplary damages, setting forth the proposition that "punitive or exemplary damages are permissible in a wrongful eviction action when a defendant, landlord acts with malice, with a willful or wanton manner or in utter disregard of the rights of others." The court did not mention the self-help component of the *Mendes* case.

the status of appellants requires a review of applicable law governing leases and assignments.

### Appellants' Status: The Assignment and the Contractual Prohibition Against Assignment

A "tenant's leasehold interest is generally freely and completely transferable." POWELL ON REAL PROPERTY § 17.04[1][b], at 17–43 (citing RESTATEMENT (SECOND) OF PROPERTY, § 15.1 and comment (b) (other citations omitted)), However, the tenant's right to transfer, that is, to assign or sublet his leasehold interest, may be restricted: "[A]n express lease provision [may] restrict[ ] the tenant's power to transfer the leasehold interest without the landlord's consent." *Id.* § 17.04[1][c], at 17–44. But, a landlord may also waive a prohibition on assignment. *Id.* § 17–04[1][c], at 17–49. Evidence of a waiver may be found in the landlord's "continued acceptance of rent coupled with knowledge of the assignment." *Id.* § 17.04[2][a], at 17–50.

■ Before examining whether the lease agreement precluded assignment, and if it did, whether the landlord waived the lease prohibition, we must ascertain which of the transaction documents executed by appellants and Mr. Gebremedhin purported to assign the lease to appellants. The Management Agreement does not qualify as an assignment. Rather, its focus is on Ms. Touelde's management of the then existing restaurant at the U Street property, the Super Café, including her responsibility for paying the monthly rent. Since Mr. Gebremedhin could terminate the Management Agreement, he retained at least a reversionary interest in the rental space at that point. Arguably, the undated Sales Agreement which appears in the record, and which the court found to have been executed in mid–1998, could be

deemed an assignment of the lease upon the satisfaction of a specified condition.

■ The Sales Agreement provided in the introductory paragraph that $10,000 would be paid "at settlement, for good-will, trade name, fixtures, *balance of the lease term*, and any and all equipment connected with the ... business." The Sales Agreement provided that "[s]ettlement shall be made on August 14, 1998." In the document dated November 24, 1998, Assignment of Lease, Mr. Gebremedhin explicitly "assign[ed] and transfer[red] to [Sarete] all [of his] rights, title and interest as Tenant in, to and under the Lease and the Security Deposit posted by [him] with [the] [l]andlord pursuant to the Lease." The "Assignment and Assumption of Lease [was] specifically conditioned upon [Sarete's] purchase from [Mr. Gebremedhin] of the assets of Café Tango." And, the Assignment of Lease was signed by Ms. Myers as Landlord. Both the Sales Agreement and the Assignment of Lease raise questions as to the effective date of the asset sale, and the trial court's findings leave doubt as to that date since they refer to three possible effective dates: August 14, 1998, November 24, 1998, and February 1999. Arguably, then, either the Sales Agreement between Mr. Gebremedhin, or the Assignment of Lease between Mr. Gebremedhin and Sarete could be deemed an effective assignment. Nevertheless, assuming that either document could be considered effective as an assignment of the lease, the next question is whether the Contract of Lease between Mr. Gebremedhin and 1344 U Street prohibited the assignment. The trial court concluded that it did, and on this point we agree.

The general view is that "restrictions on the tenant's right to transfer are to be strictly construed." POWELL ON REAL PROPERTY § 17.04[1][c], at 17–46. In that regard, a prohibition on assignment,

without more, has been strictly construed to permit the "sale of the controlling stock in the tenant corporation." *Id.* Here, since Mr. Gebremedhin signed the lease agreement with U Street as an individual, rather than in behalf of a corporation, the sale of controlling stock exception would not be applicable. At any rate, § 12(a) of the lease agreement between Mr. Gebremedhin and U Street expressly precluded "a change of beneficial or legal stock ownership" by the tenant. And, §§ 12(a) and 12(e), respectively, were drafted tightly in the landlord's favor to avoid loopholes, making it explicit that no assignment or transfer would be valid "without the prior written consent of [the][l]andlord" and without "written notice" to the landlord. Since Mr. Gebremedhin did not give written notice to U Street, and did not obtain U Street's prior written consent to the assignment to Sarete, it was not valid under § 12 of the Contract of Lease.

### The Waiver of the Prohibition Against Assignment

■ Despite the apparent violation of § 12 of the lease agreement, the question remains whether U Street waived the prohibition on assignment set forth in § 12 of the lease agreement. According to POWELL ON PROPERTY, "continued acceptance of rent coupled with knowledge of the assignment generally is construed as a waiver," *id.* at 17–50. As the general partner of U Street, Ms. Myers continued to accept rent payments directly from Mr. Samuel, even after she wrote Mr. Gebremedhin on March 18 that she considered him the tenant under the lease agreement, and even after she received a letter from Mr. Gebremedhin on March 23, 2000, announcing his return of the keys to the property, and thus relinquishing or waiving any control over the leasehold, due to a default in rent payments. Subsequent to Mr. Gebremedhin's action, in April 2000, Mr. Samuel made a rent payment and Ms.

Myers gave him a key to gain access to the property. She claimed she did so to permit him to remove his property. Yet, in late May and June, Mr. Samuel and Ms. Touelde gave Ms. Myers rent payments of $10,500 and $2,100. Again, on July 2000, Mr. Samuel made payments of $4,200 and $2,100 to Ms. Myers, and on July 11, 2000, she gave him a new key to the property, although it did not work. When she accepted these rent payments from Mr. Samuel, Ms. Myers knew she had signed the Assignment of Lease on November 24, 1998, assigning the lease to Sarete. Although Ms. Myers claimed she signed the Assignment of Lease as a favor to Mr. Samuel to enable him to obtain a liquor license, nothing but her testimony supports that claim, and nothing in the record shows that Ms. Myers ever repudiated the Assignment of Lease.

As indicated, the trial court did not address the waiver issue directly. Rather, in drawing legal conclusions concerning the assignment, the trial court focused on the lack of the landlord's consent to the assignment, despite the landlord's signature affixed to the Assignment of Lease. The trial court also emphasized the appellants' alleged fraudulent misrepresentation regarding a condition precedent to the assignment's effectiveness:

> On November 24, 1998 an [A]ssignment of Lease was entered into among Ms. Alyson Myers (Landlord), Mr. Gebremedhin (Assignor), and Sarete, Inc. (Assignee). The Assignment of [L]ease agreement acknowledged ... that the "Lease requires that the Tenant thereunder obtain Landlord's prior written consent to any assignment of Tenant's interest in the lease." Additionally, section 6 of the Assignment of Lease agreement provides that[:] "This Assignment and Assumption of Lease is specifically conditioned upon Assignee's purchase

from the Assignor of the assets of Café Tango. It is notable that section 6 was included as a condition precedent to the Assignment despite the fact that the transfer of the business had already taken place prior to the execution of the Assignment of Lease agreement, as evidenced by the various documents executing the transfer of control and sale of Sarete, Inc. D/b/a Café Tango. Thus, the Plaintiff[ ][s] fraudulently misrepresented a material condition of the Assignment. The transfer had already taken place rendering the assignment void.

### The Alleged Fraudulent or Material Misrepresentation

 There are two problems with the trial court's conclusions pertaining to the alleged fraudulent misrepresentation. First, appellee did not plead fraud, either as an affirmative defense to appellants' complaint, or in its counterclaim. We have said previously "that fraud is never presumed, and must be alleged with particularity and proved by clear and convincing evidence." *Hercules & Co. v. Shama Rest.*, 566 A.2d 31, 39 n. 16 (D.C. 1989) (citing *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978)). Super. Ct. Civ. R. 8(c) requires that "fraud" be pled as an affirmative defense.[7] Moreover, to be fraudulent, a misrepre-

sentation "must not only be consciously false but must also be intended to mislead another." RESTATEMENT (SECOND) OF CONTRACTS (RESTATEMENT) § 162, Comment (a).[8] "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *Id.* § 162(2). We discern no factual finding that appellants consciously lied to Ms. Myers about the effective date of the asset sale, or intended to mislead her regarding the effective date. Nor is there any certainty on this record that the purchase of the assets of the Café Tango by appellants had been completed prior to November 24, 1998, the date of the Assignment of Lease. "A misrepresentation is an assertion that is not in accord with the facts." RESTATEMENT, Introductory Note and § 159. Given this definition, we conclude that appellants made no fraudulent misrepresentation in the Assignment of Lease regarding their purchase of assets relating to the Café Tango. Indeed, and this is the second problem with the trial court's conclusion, the court's factual findings are ambiguous as to the effective date of the asset sale, or the date on which the purchase was completed. The trial court found that the "Bill of Sale was executed and signed by Mr. Gebremedhin, Ms. Touelde and Mr. Samuel" on August 14, 1998; that "the assets had been pur-

7. The failure of appellee to plead fraud as an affirmative defense was not necessarily fatal to its claim given its insistence that it learned at trial that Mr. Samuel and Ms. Touelde had purchased the assets of Sarete prior to the assignment of the lease. *See Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 267–68 (D.C.1987). Our conclusion rests on the absence of clear and convincing evidence of a fraudulent or material misrepresentation.

8. Section 162(1) of the RESTATEMENT provides:

A misrepresentation is fraudulent if the maker intends his [or her] assertion to induce a party to manifest his [or her] assent and the maker

(a) knows or believes that the assertion is not in accord with the facts, or

(b) does not have the confidence that he states or implies in the truth of the assertion, or

(c) knows that he does not have the basis that he states or implies for the assertion.

chased" by November 24, 1998; and that in February 1999, the "[s]ettlement [s]heet [was] signed by Mr. Gebremedhin, Ms. Touelde, and Mr. Samuel indicating all payments for the sale [had been] made to Mr. Gebremedhin." Consequently, appellants, as Mr. Samuel testified, and the court did not discredit, pinpointed February 1999 as the date on which closing on the asset sale was completed.

Not only was no fraudulent misrepresentation affirmatively pled or set forth in the counterclaim, but even assuming that the trial court could conform the pleadings to the evidence produced at trial, as appellee argues, there was no proof of a fraudulent misrepresentation as defined by the RESTATEMENT. Nor was there proof of a material misrepresentation. The evidence shows that Ms. Myers, as General Partner of U Street insisted that Sarete purchase the assets of Café Tango to protect herself. She had not previously heard of Sarete and was nervous about Sarete's financial stability and whether it had the capital to operate Café Tango. In addition, she had had no experience with either Mr. Samuel or Ms. Touelde, and was not certain that they had the expertise or the experience to run the restaurant. The testimony of Ms. Myers reveals that section 6 of the Assignment of Lease, requiring Sarete to purchase the assets of Café Tango, was inserted at her instance to ensure that U Street would at least have a landlord's lien on the assets of Sarete in the event that Sarete or Mr. Samuel or Ms. Touelde defaulted on the lease. In that respect, it cannot be said that appellants made a misrepresentation designed to induce Ms. Myers to sign the Assignment of Lease. Simply put, there was no evidence of a material misrepresentation by appellants. Hence, appellants were entitled to judgment on Count I (breach of contract) of their complaint.

### The Landlord–Tenant Relationship

■ Since we have concluded that U Street waived § 12 of its Contract of Lease, and there was no proof of a fraudulent or material misrepresentation by appellants with respect to the Assignment of Lease, we now consider appellee's argument that there was no landlord-tenant relationship between Sarete, a company in which Ms. Touelde and Mr. Samuel were the sole shareholders, and U Street because there was no "require[d] privity of contract and privity of estate between plaintiff and defendant." We note at the outset that the case on which appellee relies for this proposition is *Young, supra,* a case involving a rather straightforward question as to whether the appellant, who had moved into an apartment with a friend whose father had leased the apartment, was wrongfully evicted after he refused to move when the friend's father notified the landlord that he would vacate, and did vacate, the apartment. The answer to that question depended upon the resolution of a factual question, whether the appellant was a roomer or a tenant, a question which we remanded to the trial court. In contrast, appellants' case here concerns a commercial lease, and a much more intricate factual scenario. In *Wilson v. Hart,* 829 A.2d 511 (D.C.2003), a wrongful eviction action pertaining to a residential apartment, we left open the question as to "whether a wrongful eviction or breach of quiet enjoyment action may lie even if appellants' occupancy constituted something less than some sort of tenancy." *Id.* at 515 n. 9 (citations omitted). Furthermore, the concept of "privity" is not always regarded as a bar to a remedy. "In the light of modern development, it must be supposed that the absence of "privity" is not a sufficient reason for denying a remedy." 9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 778 (2004).

Nevertheless, we begin by examining the concept of "privity" within the leasehold context. FRIEDMAN ON LEASES ("FRIEDMAN") provides a general explanation of privity which is set forth below, in part:

> Liability between an owner of real property and parties with a leasehold interest is predicated on privity. The common law recognizes three types of privity—privity of contract, privity of estate, and a combination of privity of contract and estate. Privity of contract rests on agreement, whereas privity of estate rests on an interest in the leased premises. An original tenant, that is, one who acquires his lease directly from the owner of the property, is normally in privity of both contract and estate. His acquisition of the leasehold interest creates the privity of estate. His execution of the lease, with rare exception, includes an undertaking to pay the rent and to perform and observe the covenants in the lease on the tenant's part to be performed and observed. This creates privity of contract. If tenant assigns the lease his privity of estate thereby ends but privity of contract continues, that is, his right to possession ends but his liability under the lease continues .... The assignee acquires privity of estate. If the assignee assumes the tenant's obligations under the lease he comes under privity of contract as well.

1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7:5.1[A], at 7–98–7–99 (5th ed.2004). (footnotes omitted). Section 7:5.1[C][1][a] of FRIEDMAN elaborates further on the meaning and implications of privity, even if the landlord has not consented to an assignment:

> By receiving the assignment—regardless of landlord's consent thereto—the assignee acquires an interest in the premises that brings him into privity of estate with the owner and makes him liable to the owner for the payment of rent and on those tenant covenants that run with the land. Acceptance of the assignment creates the privity of estate and its consequent liability ... The liability imposed on an assignee by privity of estate differs in two respects from that of the original tenant, or that of an assignee who has expressly assumed the tenant obligations ....
>
> The assignee's liability created by privity of estate does not include anything that accrued before the assignment. The assignee is not liable for a breach by the original tenant or by a prior assignee. Nor is he liable for rent payable before the assignment to him even if this covers a period subsequent thereto ... but [while] ... [a]n assignee is not personally liable for prior breaches, ... he takes the lease subject to forfeiture if these breaches are not cured.

*Id* at 7–103–7–104 (footnotes omitted).

From these FRIEDMAN excerpts, we conclude that Sarete acquired privity of estate with the landlord when U Street waived § 12 of the Contract of Lease, and when it assumed Mr. Gebremedhin's obligations under the lease. Moreover, especially after Mr. Gebremedhin returned his keys to Ms. Myers, thus relinquishing or waiving any right to the leasehold, Sarete was in privity of contract with U Street. Even assuming Sarete was not in privity of contract with U Street, its privity of estate with U Street "ma[d]e [it] liable to [U Street] for the payment of rent." FRIEDMAN, *supra*, § 7:5.1[C][1][a] at 7–103. And, in that regard, there was at least "some sort of tenancy" or landlord-tenant relationship. *Wilson, supra,* 829 A.2d at 515.

### The Self–Help Doctrine

■ Given our analysis of the privity issue and our conclusion that there was at least "some sort of tenancy" or landlord-tenant relationship between at least appellant Sarete and U Street, we hold that the prohibition on self-help, articulated in *Mendes, supra,* and *Simpson, supra,* was applicable to the circumstances of the case before us, and that U Street acted wrongfully in evicting Sarete without legal process, because "statutory remedies [for reacquiring possession of property] are exclusive . . . and an action will lie in tort against a landlord who evicts a tenant without legal process." *Mendes, supra,* 389 A.2d at 782. Here, U Street evicted appellants by changing the locks to the Café Tango on more than one occasion and precluded appellants' entry. Consequently, appellants were entitled to judgment on Count II (wrongful eviction) of their complaint.

### The Rule 12(b)(6) Dismissal of the Individual Appellant's Claims

■ We turn now to the trial court's denial of damages under Counts III and IV of appellants' complaint. Damages were denied for two reasons: (1) appellants' failure "to present evidence to substantiate the damages they are seeking," and (2) appellants "were not lawful tenants because no valid assignment existed." We already have addressed the second reason relating to the validity of the assignment. As for the trial court's first reason, the absence of supporting evidence, appellants contend that had Ms. Touelde and Mr. Samuel not been dismissed as plaintiffs, they could have presented evidence of damages. This leads us to the question whether the trial court properly dismissed Mr. Samuel and Ms. Touelde with prejudice under Super. Ct. Civ. R. 12(b)(6). Judge Zeldon concluded that dismissal of the individual plaintiffs was required because "only the corporate plaintiff, [Sarete], maintains a leasehold interest in the property," and because "[t]here is no assertion in the Complaint that Plaintiff Samuel or Plaintiff Touelde have privity of contract and privity of estate with Defendant, nor has any evidence been offered by Plaintiffs on these issues."

■ "The standard by which we review the grant of a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is well settled: like the trial court, we must construe the complaint in the light most favorable to the plaintiff, while taking the facts alleged in the complaint as true." *Casco Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency,* 834 A.2d 77, 81 (D.C.2003) (citing *Cauman v. George Washington Univ.,* 630 A.2d 1104, 1105 (D.C.1993)). "We will affirm a dismissal only when it appears, beyond doubt, that the plaintiff [ ] can prove no set of facts in support of [its] claim which would entitle it to relief." *Id.* (quoting *Klahr v. District of Columbia,* 576 A.2d 718, 721 (D.C.1990)) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (quotations omitted). "The sufficiency *vel non* of the complaint raises a question of law, and we therefore owe no deference to the trial court and review the order of dismissal *de novo.*" *Larijani v. Georgetown Univ.,* 791 A.2d 41, 43 (D.C.2002) (citation omitted).

The trial court concluded that Mr. Samuel and Ms. Touelde failed to allege that they were in "privity of contract and privity of estate" with the appellee, and no "evidence [has] been offered by Plaintiffs on these issues." The court also said that "[b]ased on the information . . . in the complaint[ ] only the corporate Plaintiff, Sarete, maintains a leasehold interest in the property." It therefore dismissed the

claims of Mr. Samuel and Ms. Touelde for failure to state a claim under Super. Ct. Civ. R. 12(b)(6). Contrary to the trial court's finding, however, Mr. Samuel and Ms. Touelde did allege at least some facts which, if construed in the light most favorable to them, would have demonstrated that they had some kind of a landlord-tenant relationship with the appellee. Specifically, they alleged that: (1) "Plaintiffs, the holders of a bona fide lease at 1344 U Street . . . have been locked out of the premises at which they operated a restaurant and night club," (Paragraph 2 of the Complaint); (2) "pursuant to the terms of the lease agreement, which was an assignment of a lease agreement signed by another party the Plaintiffs were legally authorized to occupy the subject premises," (Paragraph 2 of the Complaint); (3) "Plaintiffs recall signing an Agreement with the Defendant with respect to their right to enter the premises and complete the repairs preparatory to reopening the business," (Paragraph 11 of the Complaint); and (4) "[t]he Defendant has breached the Plaintiffs rights as tenant in the premises," (Paragraph 17 of the Complaint). The Complaint may be inartfully drafted since it sometimes refers to the "Plaintiff" in the singular form, and sometimes to "Plaintiffs" in the plural form, but inartful drafting is not the standard we apply to determine whether a complaint should be dismissed under Rule 12(b)(6). ▌ The District is a notice pleading jurisdiction and "[u]nder Super. Ct. Civ. R. 8(a) and (e), a complaint is sufficient so long as it fairly puts the defendant on notice of the claim against him." *Scott v. District of Columbia*, 493 A.2d 319, 323 (D.C.1985) (citation omitted). Further-

more, "[a] complaint should not be dismissed because the court doubts that a plaintiff will prevail on a claim." *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 210 (D.C.1997) (citation omitted). Nor should a complaint be dismissed under Rule 12(b)(6) on the ground that no "evidence [has] been offered by Plaintiffs" since we "tak[e] the facts alleged in the complaint as true," *Casco Marina Dev., L.L.C., supra*, 834 A.2d at 81 (citations omitted), and the presentation of evidence to counter a Rule 12(b)(6) motion is not required. Therefore, construing the complaint in the light most favorable to Mr. Samuel and Ms. Touelde, we hold that it "fairly put[ ] [U Street] on notice of the claim[s] against [it]," and because we cannot say that "it appears, beyond doubt, that [Mr. Samuel and Ms. Touelde] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief," we reverse the trial court's Rule 12(b)(6) order of dismissal. *Id.*, (quotation and citations omitted).

### Damages

Since the trial court should not have dismissed the claims of Mr. Samuel and Ms. Touelde under Rule 12(b)(6), and since the record and our disposition of the legal issues indicate that they are entitled to judgment on Count I (breach of contract) and Count II (wrongful eviction), we remand these matters to the trial court for a damages trial. Furthermore, because the trial court did not consider the corporate appellant's claim relating to appellee's alleged illegal seizure of business property and inventory, we remand the Count III claim as to all of the appellants to the trial court for a liability and damages trial.[9]

9. With respect to damages, the trial court must determine which of the appellants, is (are) entitled to damages on each of the three causes of action—breach of contract, wrong- ful eviction, and illegal seizure of business property and inventory, and in what amount, if any.

### Trial By Jury

 Finally, we summarily dispose of appellants' contention that they were entitled to trial by jury. Clause 25 of the Contract of Lease expressly waived a jury trial "on any matters whatsoever arising out of or in any way connected with [the] Lease, the relationship of Landlord and Tenant, Tenant's use and occupancy of the Premises and/or any claim or injury or damage." We review the trial court's decision to deny a request for a jury trial *de novo*. *See Emerine v. Yancey*, 680 A.2d 1380, 1385 (D.C.1996). This is a comprehensive, unambiguous waiver and we have recognized a contractual waiver of trial by jury. *See Pers Travel, Inc. v. Canal Square Assocs.*, 804 A.2d 1108 (D.C.2002). "It is ... generally accepted that a voluntary waiver of the right to a jury trial 'suffers from no inherent constitutional or legal infirmity.'" *Id.* at 1111 (quoting *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1564 (Fed.Cir.1990), *cert. denied*, 499 U.S. 919, 111 S.Ct. 1308, 113 L.Ed.2d 243 (1991)). Appellants' reliance on *Rodenbur v. Kaufmann*, 115 U.S.App. D.C. 360, 320 F.2d 679 (1C.C.Cir.1973), is misplaced. Unlike the plaintiff's cause of action in that case, the appellants' wrongful eviction claim in the case before us is founded on the contractual obligations guaranteed in the lease. *Rodenbur*, which involved a slip and fall tort claim, is distinguishable from appellants' case because it did not concern any rights stemming from a lease. *Id.*, 320 F.2d 679, 115 U.S.App. D.C. at 363. Here, appellants' alleged right to enter the U Street property is based on the Contract of Lease. Consequently, their right to trial by jury under the Seventh Amendment to the Constitution of the United States has been waived, and the appellants are not entitled to trial by jury with respect to the matters on remand.

In sum, we reverse the trial court's order under Rule 12(b)(6) dismissing the claims of Mr. Samuel and Ms. Touelde as plaintiffs. We also reverse the trial court's order of judgment in favor of U Street on the corporate appellants' claims of wrongful eviction and breach of contract, and remand these matters to the trial court with instructions to enter judgment in favor of appellants on those claims. Furthermore, we remand the Count III claim to the trial court as to all appellants for a liability and damages trial.

*So ordered.*